# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA ACREE, as Independent Administrator of the Estate of WILLIAM ACREE, JR., deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 10 C 7812 |
| WATSON PHARMACEUTICALS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## ORDER REGARDING PLAINTIFF'S MOTIONS IN LIMINE

MATTHEW F. KENNELLY, District Judge:

In this order, the Court rules on plaintiff's motions *in limine*.

**1.     The Lane fentanyl gel experiment**

Plaintiff has moved to preclude defendants from offering in evidence, via their expert Dr. Jonathan Hadgraft or otherwise, evidence regarding a study about absorption of fentanyl gel conducted by Dr. Majella Lane in the United Kingdom. The Court concludes that this evidence should be excluded as a sanction for the failure to produce requested evidence (primarily lab notebooks) regarding the study.

Plaintiff contends that defendants, via their lawyers or otherwise, were involved in the procurement and/or design of the Lane study. The Court is not persuaded that Watson or its counsel did anything more than provide fentanyl patches for use in the

study, which is insufficient without more to give rise to an obligation on defendants' part to produce documents underlying the study.

It is indisputably true that Dr. Hadgraft, a retained defense expert, was involved in conceiving the idea for the study. That, however, likely would not be enough, without more, to give rise to an obligation on the part of defendants or Dr. Hadgraft to produce lab notebooks or other information underlying the study.

There is more than this, however. Though defendants note that Dr. Hadgraft has testified that he was not involved in designing or conducting the study, he is listed as a co-author of the published study results. In addition, and significantly, Dr. Hadgraft repeatedly testified under oath in an earlier Watson fentanyl patch trial (the *Standing* case, which was tried in California state court) to the effect that "we" – a term that in context plainly includes Dr. Hadgraft himself – decided to try to do a study regarding gel from a Watson patch; "we" used two subjects and five replications; "we" obtained certain results; and "we" felt the data correlated appropriately. *See* Pl.'s Mots. In Limine at 7-8 (quoting *Standing* trial transcript). In addition, Dr. Hadgraft testified during his deposition in the present case that he believed Dr. Lane would give him the lab notebooks if he asked her to do so.

In advance of Dr. Hadgraft's deposition in this case, plaintiff served defense counsel (who had retained Dr. Hadgraft as an expert) a request for documents that specifically sought the lab notebooks and other documents regarding the Lane fentanyl gel study. Defense counsel have advised the Court that these documents were not produced because defendants contended that they and Dr. Hadgraft had no obligation to produce them. Defendants rely primarily on the fact that Dr. Hadgraft does not have

the documents and that they belong to and are in the custody of Dr. Lane.  The Court rejects this argument.  A party or subpoenaed witness is required to produce not just documents that are in his possession or custody, but also documents that are in his control.  *See* Fed. R. Civ. P. 30(b)(2) (deposition notice may include request for documents, cross-referencing Fed. R. Civ. P. 34); *id.* 34(a)(1) ("possession, custody, or control"); *id.*45(a)(1)(A)(iii) (same).

Based on the record, the Court finds that the documents in question were in Dr. Hadgraft's control.  *See, e.g., Ice Corp. v. Hamilton Sundstrand Corp.*, 245 F.R.D. 513, 517 (D. Kan. 2007) (person has control over documents if, among other things, he has the practical ability to obtain them from another).  His testimony at the *Standing* trial tends to show that he was involved in setting up and performing the Lane study, and the Court is unpersuaded by defense counsel's argument at the motion hearing that this was simply "not careful" testimony on Dr. Hadgraft's part.  Second, the fact that Dr. Hadgraft was a listed co-author of the study tends to show that he was involved enough to get credit in the scientific community and thus that he had ready access to the lab notebooks.  Third, Dr. Hadgraft specifically testified that he believed Dr. Lane would provide him with the notebooks if he asked.  These facts together establish that the documents underlying the study were in Dr. Hadgraft's control.  That being the case, he and defendants were obligated to produce the documents in response to plaintiff's request for them in conjunction with his deposition.

The failure to produce these documents was neither justified nor harmless.  First, it was not harmless because the non-production effectively deprived plaintiff from being able to inquire about the conduct of the study.  In this regard, defendants' contention

3

that they were willing to make Dr. Lane available for a deposition is of no consequence. Discovery had closed at the time, and plaintiff was not required to acquiesce to a reopening of discovery at the late date in question in order to allow defendant and Dr. Hadgraft to cure their noncompliance with the document request. Second, the non-production was not justified because the evidence clearly shows that the documents in question were within Dr. Hadgraft's control.

The appropriate sanction is to preclude reference to the Lane study at the trial in this case. No other sanction would appropriately cure the misconduct.

**2.	"New opinions" by Dr. Milroy**

Plaintiff seeks to preclude defendants from eliciting from defense expert Dr. Christopher Milroy any opinions regarding cause of death that were not contained in his Rule 26(a)(2) report. Shortly before plaintiff deposed Dr. Milroy, defendants disclosed additional materials he had just recently reviewed, including certain histology slides. Plaintiff asked the Court to direct defendants to provide a supplemental Rule 26(a)(2) disclosure. At the hearing on the motion, defense counsel expressly represented that Dr. Milroy had no new or additional opinions not disclosed in his original Rule 26(a)(2) disclosure. In reliance on this representation, the Court declined to order a supplemental disclosure.

In his original report, Dr. Milroy stated that the cause of Mr. Acree's death could not be determined. He also opined that fentanyl overdose was *not* the cause of Mr. Acree's death. The Court agrees with defendants that there is no basis to preclude Dr. Milroy from rendering these opinions at the trial.

Plaintiff asks the Court to bar defendants from eliciting from Dr. Milroy any opinion regarding the cause of death. In his Rule 26(a)(2) disclosure, Dr. Milroy did not offer any opinion regarding what the cause of death was (as opposed to what it was not). In their response to plaintiff's motion, defendants represent that they do not intent to offer any opinion in this regard from Dr. Milroy on direct examination. The Court holds defendants to that representation and thus precludes them from doing this. Defendants also represented that if they believe an affirmative opinion by Dr. Milroy on the cause of death is appropriately admissible on redirect or in rebuttal, they will seek permission in advance outside the jury's presence. It is so ordered.

**3.     The Andresen-Anders study**

Earlier this year, after the deadline for Rule 26(a)(2) disclosures, defendants attempted to designate two scientists who reside in Germany, Hilke Andresen and Sven Anders, as experts pursuant to Rule 26(a)(2). Their proposed testimony concerned fentanyl concentration in human blood.

The Court struck these witnesses for reasons described in a decision it issued in July of this year. *See Acree v. Watson Pharms., Inc.*, No. 10 C 7812, 2012 WL 3006551 (N.D. Ill. July 23, 2012). At a later hearing in open court, on August 8, 2012, the Court made further comments regarding whether and the extent to which the results of the Andresen study (including an article reporting the study) might be admissible in evidence via other expert witnesses. *See* Pl.'s Mots. In Limine, Ex. 10 (Aug. 8, 2012 transcript) at 27-29. The Court need not rehash those comments here other than to say that it stands by them.

5

Plaintiffs have moved the Court to preclude any defense experts from relying on the Andresen article or referring to it during testimony at trial.  Defendants object.  A good deal of their objection consists of revisionist history or arguments that miss the point.  First, the fact that defendants supposedly offered to make the two scientists available in Amsterdam for a deposition ignores the fact that the Court barred them as witnesses, not to mention the fact that this purported offer came long after the close of discovery.  Second, defendants note that the rules of evidence regarding expert testimony do not preclude an expert from relying on a scientific study just because the opposing party was unable to depose the study's authors.  That is true, but it ignores the fact that defendants *did* offer, or at least attempted to offer, Andresen and Anders *as defense experts* but did so in a way that the Court concluded was both belated and improper.

Despite these factors, the Court is not persuaded that it would be appropriate to bar all reliance on or reference to the Andresen-Anders published study.  The Court believes that the appropriate way to address this issue is to consider what the state of affairs would have been had defendants never designated the two scientists as experts – because, at a basic level, that is how things now stand.  In that situation, there would be no basis to bar other defense experts from relying on the Andresen-Anders published study, assuming defendants can lay the foundation that it is the type of data upon which experts in the field would reasonably rely.  *See* Fed. R. Evid. 703.  The expert designation episode recounted above does not change things in a material way.  In particular, plaintiff is no worse off as things now stand than she would have been had defendants never proposed Andresen or Anders as experts.

6

For this reason, if defendants lay the appropriate foundation under Rule 703 as referenced above, they may elicit that the published study supports their testifying expert's opinions. It is a separate question, however, whether the *contents* of the study are admissible. *See* Fed. R. Evid. 703 (final sentence). The Court reserves judgment on this until the appropriate time at trial. Defendants may not elicit the study's contents, however, without first seeking and obtaining advance permission outside the presence of the jury.

On a related point, the Court notes that at the August 8, 2012 hearing referenced above, defense counsel expressly disavowed any intention to offer via their experts, in particular Dr. Curry, evidence regarding communications with Drs. Andresen or Anders regarding their study or article. *See* Pl.'s Mots. In Limine, Ex. 10 at 27. The Court will hold defendants to that express representation. Even without that representation, anything that Dr. Curry or other experts might have learned from communications with Drs. Andresen or Anders would be inadmissible hearsay, and the unfairly prejudicial effect of its admission (given the circumstances discussed in the July 23 decision and defense counsel's disavowal at the August 8 hearing) would greatly outweigh any probative value that information might have. *See* Fed. R. Evid. 703.

**4 & 5.**     **References to other fentanyl patch lawsuits involving plaintiff's attorneys; references to plaintiff's attorneys advertising for clients**

Defendants have not responded to plaintiff's argument that evidence regarding advertising by plaintiff's counsel is inadmissible. The Court agrees with plaintiff that this evidence is utterly irrelevant and therefore excludes it.

Plaintiff also asks the Court to bar references to fentanyl patch lawsuits that plaintiff's attorneys have filed on behalf of other clients. Defendants appear to contend

7

that evidence that plaintiff's attorneys have filed defective-design lawsuits against fentanyl patch manufacturers using an alternative design (a "matrix" design) is relevant for some purpose in this case. That argument is entirely lacking in merit, and the Court rejects it. The plaintiff's attorneys do not in any way, shape, or form act as her agent when representing other clients – defendants offer no authority to the contrary – so evidence regarding her attorneys' involvement in other litigation has no relevance or probative value with regard to the claims and defenses in this plaintiff's case. The Court excludes this evidence pursuant to Rules 401-403.

At the hearing on the motions *in limine*, defense counsel said that they want to be able to cross examine plaintiff's expert Dr. Prausnitz regarding his awareness of lawsuits involving matrix-type patches and his failure to inquire into information regarding fentanyl levels in patients using such patches. As the Court indicated at argument, this would be proper cross-examination, so the Court will not bar it.[1] Defense counsel also said, however, that they want to cross-examine Dr. Prausnitz regarding expert reports issued on behalf of plaintiffs in matrix patch litigation taking the position that the "LRS" design that Watson used is superior to the matrix design. The Court precludes this evidence. It is appropriate to cross-examine an expert regarding medical literature on the topic at issue that he has or has not reviewed, but an expert report, which is prepared for litigation purposes at the behest of an advocate for one side or the other, lacks (for that and other reasons) the probative value that published literature or

---

[1] That said, as indicated at the hearing on the motions, the Court will not permit defendants to get in via such cross-examination the *contents* of reports regarding such fentanyl levels unless they independently establish a foundation for the admissibility of this information. The probative value of this information, which involves other cases and/or other deaths, does not substantially outweigh its prejudicial effect, given the fact that its accuracy and weight has not been subject to testing via the discovery process.

scientific studies might have.  The Court precludes this cross-examination pursuant to Rules 401-403.

**7.      Evidence regarding certain drugs in Mr. Acree's blood**

Postmortem blood testing of Mr. Acree resulted in findings reflecting a level of cannabinoids in his blood that conceivably might be consistent with secondhand exposure and arguably are consistent with marijuana use.  Plaintiff asks the Court to exclude this evidence, arguing that no expert has opined that marijuana had anything to do with Mr. Acree's death and that the evidence is unfairly prejudicial.

The Court agrees with defendants that this evidence is relevant due to testimony by defense expert Dr. Milroy that natural disorders (including pneumonia) might have caused or contributed to Mr. Acree's death; marijuana use increases one's risk of pneumonia; marijuana use also could affect one's lung function; and examination of Mr. Acree's lung tissue showed signs consistent with smoking.  This evidence, which arguably suggests marijuana use or at least exposure, has a potential for unfair prejudice but not such a potential that substantially outweighs the evidence's probative value.  The Court denies this motion *in limine*.

**6 & 8.       Evidence of criminal activity**

The Court bars evidence and questioning regarding alleged or actual criminal activity by Mr. Acree's siblings or other relatives.  Certain of his siblings evidently pled or were found guilty of offenses relating to precursor chemicals for methamphetamine.  Defendants have utterly failed to establish that this information is in the least bit relevant regarding Mr. Acree's claims, either on liability or damages.  In addition, the unfair

9

prejudice that would result from its admission would wildly exceed any conceivable probative value that this information might have.

Defendants also want to offer evidence that Mr. Acree was facing a precursor chemical charge himself when he died. The charge was then dismissed, presumably due to his death. Thus all defendants have is a criminal charge; there was no adjudication of guilt. Again, defendants have completely failed to show that this evidence is in any way relevant regarding the matters at issue in this case. There is no indication that Mr. Acree's death had anything whatsoever to do with methamphetamine, nor have defendants articulated a viable argument that the pending charge has any relevance or probative value on the question of damages.

The Court has separately ruled that defendants may introduce evidence that the postmortem blood test of Mr. Acree showed chemicals consistent with marijuana exposure or use. If defendants introduce this evidence, they may argue its impact on the question of damages. In that regard, that particular evidence is neither irrelevant nor unfairly prejudicial.

## 9. Evidence of prescription drug misuse

Defendants want to introduce evidence that the medical examiner found outlines of four patches on Mr. Acree, when he was prescribed to wear two. Plaintiff's counsel stated at the hearing on the motions *in limine* that plaintiff is not asking the Court to exclude this evidence, and the Court agrees that it is properly admissible.

Defendants also note that postmortem blood testing showed elevated levels of certain other medications and no level of hydrocodone even though it had been prescribed for Mr. Acree. The Court finds this evidence relevant and admissible,

because it arguably tends to show noncompliance with the prescribed regimen of medications.

**10.    Duplicative expert testimony**

Plaintiff asks the Court to bar defendants from offering more than one expert on a topic. She contends that three of defendants' experts, Dr. Milroy, Dr. Curry, and Dr. Hearn, are all being called to testify about the topic of postmortem redistribution (PMR) of substances in the bloodstream.

This District's pretrial order rules provide that "[o]nly one F.R. Evid. 702 witness on each subject for each party will be permitted to testify absent good cause shown." Form LR 16.1.1, n.7. Plaintiff also argues that presentation of duplicative expert testimony runs afoul of Federal Rule of Evidence 403. The Court agrees with the latter proposition as a general matter but finds persuasive defendants' argument at the motion hearing that the testimony in question will not be duplicative. Specifically, defense counsel represented that Dr. Curry will testify about how PMR works and the proposition that fentanyl is subject to PMR and will opine that one cannot work backwards from a postmortem blood fentanyl level to determine the antemortem level. Dr. Hearn will not be explaining how PMR works but instead will focus his testimony on what is found in the laboratory regarding PMR with respect to fentanyl. Dr. Milroy will testify that due to the phenomenon of PMR, it was inappropriate to attribute the cause of Mr. Acree's death to a fentanyl overdose even if the postmortem level of fentanyl in his blood exceeded therapeutic levels. These experts' testimony on these topics is interrelated, but the Court is not persuaded that it is duplicative. Plaintiff should, however, object at

trial if she believes that defendants are, despite their arguments at the motion hearing, presenting duplicative expert testimony.

                                                                                  _____
                                                                                   MATTHEW F. KENNELLY
                                                                                United States District Judge

Date:  November 21, 2012